Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Jul 23 2012, 8:53 am

CLERK
of the supreme court,
court of appeals and
tax court

ATTORNEY FOR APPELLANT:

**DONALD R. SHULER**
Barkes, Kolbus, Rife & Shuler, LLP
Goshen, Indiana

ATTORNEYS FOR APPELLEE:

**GREGORY F. ZOELLER**
Attorney General of Indiana

**JODI KATHRYN STEIN**
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| SAVANE E. WILLIAMS, )<br>)<br>Appellant-Defendant, )<br>)<br>vs. )<br>)<br>STATE OF INDIANA, )<br>)<br>Appellee-Plaintiff. ) | No. 20A04-1106-CR-428 |

APPEAL FROM THE ELKHART CIRCUIT COURT
The Honorable Gene R. Duffin, Judge
Cause No. 20C01-9808-CF-40

**July 23, 2012**

**MEMORANDUM DECISION – NOT FOR PUBLICATION**

**MATHIAS, Judge**

Following a jury trial in 2000, Savane E. Williams ("Williams") was convicted in Elkhart Circuit Court of two counts of Class A felony dealing in cocaine. In this belated appeal, Williams presents six issues for our review, which we restate as:

I. Whether the trial court erred in denying Williams's motion for a change of judge;

II. Whether the trial court's admission of evidence regarding a confidential informant's conduct constituted impermissible hearsay and violated Williams's right to confront witnesses;

III. Whether the State presented sufficient evidence to support Williams's convictions;

IV. Whether Indiana Code section 35-48-4-16 should be retroactively applied to Williams's convictions, thereby reducing his convictions from Class A to a Class B felonies;

V. Whether Williams's habitual offender enhancement constituted an improper double enhancement; and

VI. Whether the trial court erred in sentencing Williams to an aggregate term of eighty years incarceration.

The State concedes that the trial court improperly ordered that Williams serve a separate, consecutive sentence as a result of his habitual offender adjudication. We agree with the State that the trial court erred in the manner in which it imposed the habitual offender enhancement, but we otherwise affirm Williams's convictions and sentence.

**Facts and Procedural History**

In the summer of 1998, Detective Mark Dagy ("Detective Dagy") of the Elkhart Drug Task Force received information that Williams was selling cocaine. Dagy decided to use the services of a confidential informant, Chris Thomas ("Thomas"), in his

2

investigation of Williams's suspected drug dealing. Thomas and Williams had been friends since childhood, and Thomas was a reliable, experienced confidential informant.[1]

On July 17, 1998, Detective Dagy met Thomas in a motel room where Thomas was living. This motel room is 700 feet from Hayden Park in Elkhart, Indiana. Dagy instructed Thomas to contact Williams and set up a meeting where Thomas could purchase cocaine from Williams. Shortly before the controlled buy, Detective Dagy searched Thomas's motel room, searched Thomas, placed a microphone on Thomas, and gave him $60 in cash that had been photocopied. Detective Dagy then left the motel room and met with another officer to observe the scheduled buy. Other officers were also nearby listening to the audio transmissions coming from the microphone Detective Dagy had placed on Thomas.

Shortly thereafter, Williams drove into the motel parking lot in a large, green car and parked in front of Thomas's motel room. Also inside the car was Williams's adult niece, Ella Davis. Thomas came out of his motel room, approached the driver's side window of Williams's car, and gave Williams $40 in cash. Williams reached into the waistband of his pants, removed a small bag, took two rocks of crack cocaine out of the bag, and handed them to Thomas.[2] After speaking with Williams briefly, Thomas stepped away from the car. Williams then drove away from the motel. Minutes later, Thomas approached Detective Dagy's vehicle and handed him the two rocks of cocaine

---

[1] Thomas had motivation to work with the police; he was facing a Class A felony drug charge and was also paid $40 to $50 by the police for each drug transaction in which he acted as a confidential informant.

[2] These two rocks of cocaine weighed 0.317 grams in total.

3

he had purchased from Williams and the remaining $20 in cash. Detective Dagy again searched Thomas and his motel room and found nothing.

Detective Dagy later contacted Thomas and set up another controlled buy to take place on July 23, 1998. Detective Dagy photocopied another $60 in cash, then met Thomas at a nearby restaurant parking lot, searched Thomas, placed a microphone on him, and gave him the photocopied cash. Thomas then walked across the street to the motel parking lot, while Detective Dagy went to a parking lot west of Thomas's motel room. This time, however, another detective was in a car approximately twenty feet away from Thomas's motel room and videotaped the transaction.

Williams arrived in his large, green car shortly before 7:00 p.m. This time, he was accompanied by his friend Jeffrey Fletcher ("Fletcher"), who knew that he and Williams were going to the motel to sell cocaine to Thomas, an acquaintance of Fletcher's. Williams again parked his car in front of Thomas's motel room, and Thomas again approached the driver's side of the car. Thomas handed Williams the buy money, and Williams reached into his pants and removed several rocks of crack cocaine. This time, Williams gave Thomas three rocks of cocaine. After speaking with Thomas, Williams got out of his car and spoke to others nearby. Afterward, Thomas met with Detective Dagy and handed him the cocaine. Dagy then searched Thomas and found no other contraband or money.

As a result of these controlled buys, the State charged Williams with two counts of Class A felony dealing in cocaine within 1,000 feet of a park. The State also alleged that Williams was a habitual offender based on his 1988 conviction for Class D felony

4

criminal recklessness and his 1993 conviction for Class D felony possession of a handgun by a felon.

On February 10, 2000, Williams filed a motion for change of judge, claiming that the trial court judge was biased against him and had previously recused himself in other cases involving Williams. After a pre-trial conference held on February 15, 2000, the trial court denied Williams's motion for change of judge. Sometime before Williams's February 2000 trial, Thomas died. Williams then filed a motion in limine seeking to exclude evidence the State learned from Thomas. The trial court granted this motion "as to hearsay from [Thomas]." Appellant's App. p. 49.

Williams's jury trial was held on February 22 to February 24, 2000. Williams testified on his own behalf and claimed that he only came to the motel to "hang out" with Thomas. Tr. pp. 319, 327. Ultimately, the jury found Williams guilty as charged and also determined that he was a habitual offender. The trial court sentenced Williams to concurrent terms of fifty years on each Class A felony conviction and imposed a consecutive thirty-year sentence as a result of the habitual offender adjudication.

Williams did not file a notice of appeal within thirty days of the trial court's sentencing order. Instead, he filed a petition for permission to file a belated notice of appeal on February 22, 2001, almost a year after his sentencing. The trial court denied this petition without a hearing the same day it was filed. Over a year later, on September 15, 2002, Williams filed another petition for permission to file a belated notice of appeal. For reasons not apparent on the record, this was not entered on the trial court's docket until June 1, 2007, nearly five years later. The trial court held a hearing on this petition

on July 20, 2007, and again denied Williams's petition. Undeterred, Williams filed a third petition for permission to file a belated notice of appeal on June 20, 2011. The trial court held a hearing on this petition on August 4, 2011. This time, the trial court granted Williams's petition,[3] and this appeal ensued.

## I. Denial of Motion for Change of Judge

Williams first claims that the trial court erred in denying his motion for change of judge. A trial court's ruling on a motion for change of judge is reviewed under the clearly erroneous standard, and the law presumes that a judge is unbiased and unprejudiced. Garland v. State, 788 N.E.2d 425, 433 (Ind. 2003).

Indiana Criminal Rule 12 provides in relevant part:

**(D) Time Period for Filing Request for Change of Judge or Change of Venue.** In any criminal action, no change of judge or change of venue from the county shall be granted except within the time herein provided.

*(1) Ten Day Rule.* An application for a change of judge or change of venue from the county shall be filed within ten (10) days after a plea of not guilty, or if a date less than ten (10) days from the date of said plea, the case is set for trial, the application shall be filed within five (5) days after setting the case for trial. Provided, that where a cause is remanded for a new trial by the Supreme Court or Court of Appeals, such application must be filed not later than ten (10) days after the party has knowledge that the cause is ready to be set for trial.

*(2) Subsequently Discovered Grounds.* If the applicant first obtains knowledge of the cause for change of venue from the judge or from the county after the time above limited, the applicant may file the application, which shall be verified by the party specifically alleging

---

[3] Despite the nearly four-year delay between the trial court's July 2007 denial of Williams's second request for a belated appeal and Williams's third request for a belated appeal in June 2011, the State makes no argument that the trial court erred in granting Williams's request for permission to file a belated appeal. See Ind. Post-Conviction Rule 2(1)(a)(3) (requiring that a defendant seeking permission to file a belated appeal must show that "the defendant has been diligent in requesting permission to file a belated notice of appeal under this rule.").

> when the cause was first discovered, how it was discovered, the facts showing the cause for a change, and why such cause could not have been discovered before by the exercise of due diligence. Any opposing party shall have the right to file counter-affidavits on such issue within ten (10) days, and after a hearing on the motion, the ruling of the court may be reviewed only for abuse of discretion.

The law is settled that a defendant is not entitled to a change of judge where the mandates of Criminal Rule 12 have not been followed. Flowers v. State, 738 N.E.2d 1051, 1059 (Ind. 2000).

Here, Williams entered a plea of not guilty on August 29, 1998. He did not file his motion for change of judge until February 10, 2000, shortly before his trial and seventeen months after his plea. Clearly, Williams's change of judge motion was untimely. And Williams can find no support for his claim in Criminal Rule 12(D)(2) because he makes no claim that he learned of the basis of his change of judge motion after the expiration of the ten-day rule set forth in Criminal Rule 12(D)(1). Under these facts and circumstances, the trial court's denial of Williams's motion was not clearly erroneous. See Smith v. State, 497 N.E.2d 601, 605 (Ind. Ct. App. 1986) (holding that defendant's motion for change of judge was properly denied because it was filed beyond the time specified by Criminal Rule 12(D), even assuming that "some merit underlies the assertion of undue influence" on the part of the trial judge); see also Johnson v. State, 472 N.E.2d 892, 906 (Ind. 1985) (trial court properly denied defendant's motion for change of venue where motion was not filed within the ten-day period of Criminal Rule 12(D)(1) and where motion did not set forth reasons for untimely delay as required by Criminal Rule 12(D)(2)).

7

Anticipating our conclusion that his motion was untimely, Williams claims that the denial of his motion constituted fundamental error requiring reversal of his convictions. We disagree. As Williams notes, the fundamental error doctrine is "extremely narrow" and applies only when the error constitutes a blatant violation of basic principles, the harm or potential for harm is substantial, and the resulting error denies the defendant fundamental due process. Mathews v. State, 849 N.E.2d 578, 587 (Ind. 2006). To constitute fundamental error, the error claimed must either make a fair trial impossible or constitute clearly blatant violations of basic and elementary principles of due process. Brown v. State, 929 N.E.2d 204, 207 (Ind. 2010). This exception is available only in egregious circumstances. Id.

Here, other than adverse rulings, Williams refers us to nothing that the trial judge did in the present case that would indicate that the trial judge was biased against him. It is well settled that, "[t]he mere assertion that certain adverse rulings by a judge constitute bias and prejudice does not establish the requisite showing." Voss v. State, 856 N.E.2d 1211, 1217 (Ind. 2006) (citing Ware v. State, 567 N.E.2d 803, 806 (Ind. 1991)). Under these facts and circumstances, we are unable to conclude that the denial of Williams's motion for change of judge constituted fundamental error.

## II. Testimony Concerning Confidential Informant

Williams next argues that the trial court erred in the admission of evidence learned from the confidential informant, Thomas, who died prior to Williams's trial. The admission of evidence is within the sound discretion of the trial court, and we review the court's decision only for an abuse of that discretion. Boatner v. State, 934 N.E.2d 184,

186 (Ind. Ct. App. 2010). The trial court abuses its discretion only if its decision is clearly against the logic and effect of the facts and circumstances before the court, or if the court has misinterpreted the law. Id.

Prior to trial, Williams filed a motion in limine seeking to exclude from evidence "any fact learned by the State's witness from [Thomas], being the source of the fact." Appellant's App. pp. 43-44. The trial court granted Williams's motion "as to hearsay from [Thomas]." Id. at 49. During the trial, Detective Dagy testified that Thomas handed him the crack cocaine he had purchased from Williams after both controlled buys. Tr. pp. 42-43, 56, 79-80. Williams objected to this testimony on hearsay grounds and now argues that "the admission of this evidence was improper as it consisted of hearsay evidence, resulted in establishing an improper chain of custody for the admission of the cocaine, and infringed upon his Sixth Amendment right to confrontation." Appellant's Br. p. 18.

As a general rule, hearsay evidence is inadmissible. Boatner, 934 N.E.2d at 186 (citing Ind. Evidence Rule 802). Hearsay is defined as an out-of-court statement offered in court to prove the truth of the matter asserted. Id. (citing Ind. Evidence Rule 801(c)). A "statement" is in turn defined as "'(1) an oral or written assertion or (2) nonverbal conduct of a person, if it is intended by the person as an assertion.'" Pritchard v. State, 810 N.E.2d 758, 760 (Ind. Ct. App. 2004) (quoting Ind. Evid. R. 801(a)). To be an assertion, a statement must allege a fact susceptible of being true or false. Id. "An example of nonverbal conduct that constitutes an assertion is a witness's identification of a perpetrator by pointing." Sandefur v. State, 945 N.E.2d 785, 788 (Ind. Ct. App. 2011).

Here, we conclude that the evidence at issue—Detective Dagy's testimony that Thomas handed him cocaine after the controlled buys—was not a "statement" as defined in Evidence Rule 801(a). There is nothing that would indicate that Thomas's actions were intended to be an assertion in the same sense as pointing at a suspect to identify him as the perpetrator. In this sense, our case is similar to Pritchard.

In Pritchard, a surveillance video camera had recorded the defendant's actions during an attack on another inmate in jail. Two witnesses—a police Sergeant and a nurse—testified at trial as to what they had observed on the video recording, but the videotape itself was never introduced because it had been "purged." Pritchard, 810 N.E.2d at 760. On appeal, the defendant argued that this testimony constituted impermissible hearsay. We disagreed, noting that the defendant's conduct depicted on the tape consisted of Pritchard entering his victim's cell, running from it, and throwing something into the shower area. Id. at 761. We concluded that such conduct was not meant to be an "assertion" by Pritchard, nor did his cellmate intend his conduct in entering and exiting the showers to be an assertion. Id. Because the conduct on the videotape was not a "statement," the evidence at issue was not hearsay. Id.

Similarly, here, Detective Dagy testified that Thomas handed him cocaine. There is no indication that Thomas pointed at Williams or otherwise made any non-verbal assertion. Accordingly, we conclude that Detective Dagy's testimony did not relate any out-of-court statement made by Thomas and did not constitute hearsay.[4] See id.; see also

_____

[4] Williams also argues that, if Thomas's conduct of handing the cocaine to Detective Dagy was not an assertion that the cocaine came from Williams, then the State failed to properly establish the first step in

United States v. Cassano, 372 F.3d 868, 882-83 (7th Cir. 2004) (holding that witness's testimony that two men did not help him cash checks was not hearsay because their conduct of not helping the witness was non-assertive), vacated on other grounds, 543 U.S. 1109 (2005).

Williams also claims that the admission of evidence regarding Thomas's actions violated his right to confront witnesses. See Crawford v. Washington, 541 U.S. 36, 68, (2004) (interpreting the confrontation clause of the Sixth Amendment to mean that "[w]here testimonial [hearsay] evidence is at issue . . . the Sixth Amendment demands what the common law required: unavailability and a prior opportunity for cross-examination."). Here, however, Williams did not object to Detective Dagy's testimony based on Crawford or the Sixth Amendment. His objections were instead solely based on grounds of hearsay. See Tr. pp. 42-43, 56, 79-80. "A party may not object to the admission of evidence on one ground at trial and seek reversal on appeal based on a different ground." Boatner, 934 N.E.2d at 187. Williams's confrontation claim is therefore waived. See id.; see also Small v. State, 736 N.E.2d 742, 747 (Ind. 2000) (concluding that defendant waived confrontation issue where his trial objection was based solely on argument that testimony was hearsay); Haley v. State, 736 N.E.2d 1250,

the chain of custody. We disagree. "Under the chain of custody doctrine, an adequate foundation is laid when the continuous whereabouts of an exhibit is shown *from the time it came into the possession of the police*." Cockrell v. State, 743 N.E.2d 799, 808 (Ind. Ct. App. 2001) (citing Bell v. State, 610 N.E.2d 229, 232-33 (Ind. 1993)). Here, there is no question regarding the whereabouts of the evidence after it came into the possession of the police. Moreover, Detective Dagy searched Thomas before each controlled buy and found no cocaine, and after each controlled buy, Thomas gave Detective Dagy cocaine. From this, the jury could reasonably conclude that the cocaine came from Williams.

1252 (Ind. Ct. App. 2000) (concluding that defendant's objection to a statement only on hearsay grounds resulted in a waiver of his confrontation claim).[5]

In summary, the trial court did not abuse its discretion in admitting Detective Dagy's testimony regarding what he observed Thomas do.

### III. Sufficiency of the Evidence

Next, Williams claims that the State failed to present sufficient evidence to support his convictions. Upon a challenge to the sufficiency of evidence to support a conviction, we neither reweigh the evidence nor judge the credibility of the witnesses; instead, we respect the exclusive province of the trier of fact to weigh any conflicting evidence. McHenry v. State, 820 N.E.2d 124, 126 (Ind. 2005). We consider only the probative evidence and reasonable inferences supporting the verdict, and we will affirm if the probative evidence and reasonable inferences drawn from the evidence could have allowed a reasonable trier of fact to find the defendant guilty beyond a reasonable doubt. Id. To convict Williams of dealing in cocaine as a Class A felony, the State was required to prove that he knowingly or intentionally delivered cocaine within one thousand feet of a public park. See Ind. Code § 35-48-4-1(b)(3)(B)(ii); see also Appellant's App. p. 15.

*A. Delivery*

Williams first claims that there was insufficient evidence to support the element of delivery. Williams argues that there was insufficient evidence because none of the police

---

[5] Waiver notwithstanding, Williams's argument fails on the merits. Again, there was no evidence regarding anything Thomas said, only what Detective Dagy observed Thomas do. And Williams had ample opportunity to cross-examine Detective Dagy. Moreover, we have already concluded that what Thomas did was not a statement.

officers observing the controlled buy actually saw Williams hand the cocaine to Thomas. Williams admits that there were eyewitnesses to both of the controlled buys: Williams's niece Davis was in the car with Williams on July 17 and saw Williams take a bag of cocaine out of his pants, remove two rocks of cocaine, and hand them to Thomas in exchange for $40; and Fletcher was in the car with Williams on July 23 and saw Williams take a bag of cocaine out of his pants, remove three rocks of cocaine, and hand them to Thomas in exchange for $60.

Williams acknowledges that the testimony of a single eyewitness is sufficient to sustain a conviction. See Badelle v. State, 754 N.E.2d 510, 543 (Ind. Ct. App. 2001) (citing Emerson v. State, 724 N.E.2d 605, 609-10 (Ind. 2000)). However, Williams argues that Davis and Fletcher had motives to provide testimony favoring the State, noting that both were facing criminal charges. This, however, is little more than a request that we reassess the credibility of these witnesses and come to a conclusion contrary to that reached by the jury. This we will not do.

Moreover, the testimony of these witnesses was corroborated by the police officers who witnessed the controlled buy. Detective Dagy testified that on both occasions, he searched Thomas prior to the controlled buy and gave Thomas buy money. Thomas then walked to Williams's car and engaged in a transaction. When Thomas returned, he gave Detective Dagy cocaine, and had less or none of the buy money. This, combined with the testimony of the eyewitnesses who saw Williams provide Thomas with cocaine in exchange for money, is sufficient to establish that Williams delivered cocaine to Thomas.

13

*B. Within One Thousand Feet of a Public Park*

Williams also challenges the evidence used to support the element that he delivered cocaine within 1,000 feet of a public park. See Ind. Code § 35-48-4-1(b)(3)(B)(ii). To establish this element, the State presented the testimony of Elkhart County Surveyor Blake Doriot ("Doriot"), who testified that he used an aerial tax map to determine that the distance from Hayden Park[6] to Thomas's motel room was 700 feet. On appeal, Williams complains that Doriot did not himself conduct exact surveys of the boundaries of the park and admitted that his approximation of the park's boundaries was based on the tax parcel number, not the legal description of the park. Thus, Williams argues that, "[w]ithout a boundary survey that clearly delineates the boundaries of Hayden Park, . . . it cannot be said, beyond a reasonable doubt, that [Thomas's motel room] was within one thousand feet [of the park]." Appellant's Br. p. 30. Again, we disagree.

Doriot testified that he physically verified the locations in question on the aerial tax map. And Matt McNeil, the assistant superintendent of the Elkhart Parks and Recreation Department, testified that he was familiar with Hayden park and identified the boundaries of the park on the aerial map with a yellow marker. And Doriot testified that, based on the aerial tax map, Thomas's motel room was 700 feet from Hayden Park. From this evidence, the jury could reasonable conclude that Williams delivered cocaine to Thomas within 1,000 feet of a public park. See Dixon v. State, 712 N.E.2d 1086, 1093

---

[6] Williams makes no argument that Hayden Park was not a "public park" for purposes of Indiana Code section 35-48-4-1(b)(3)(B)(ii).

(Ind. Ct. App. 1999) (concluding State presented sufficient evidence to establish that defendant delivered cocaine within 1,000 feet of a school based *inter alia* on testimony of county surveyor who testified that the location at issue was 650 feet from a middle school, based on current tax map overlaid with aerial photograph). Williams's claim to the contrary is simply a request that we consider the map unreliable, but this is an issue of the weight to be given to the evidence, and we do not reweigh evidence on appeal. McHenry, 820 N.E.2d at 126.

#### IV. Retroactive Application of Indiana Code Section 35-48-4-16

Williams also argues that Indiana Code section 35-48-4-16 should be applied retroactively to his case, resulting in a reduction of his convictions from Class A felonies to Class B felonies. Indiana Code section 35-48-4-16, which was effective July 1, 2001, provides in relevant part:

> (a) For an offense under this chapter that requires proof of:
>     (1) delivery of cocaine, a narcotic drug, methamphetamine, or a controlled substance;
> * * *
> within one thousand (1,000) feet of school property, a public park, a family housing complex, or a youth program center, the person charged may assert the defense in subsection (b) or (c).
>
> (b) It is a defense for a person charged under this chapter with an offense that contains an element listed in subsection (a) that:
>     (1) a person was briefly in, on, or within one thousand (1,000) feet of school property, a public park, a family housing complex, or a youth program center; and
>     (2) no person under eighteen (18) years of age at least three (3) years junior to the person was in, on, or within one thousand (1,000) feet of the school property, public park, family housing complex, or youth program center at the time of the offense.
>
> (c) *It is a defense for a person charged under this chapter with an offense that contains an element listed in subsection (a) that a person was in, on, or*

15

*within one thousand (1,000) feet of school property, a public park, a family housing complex, or a youth program center at the request or suggestion of a law enforcement officer or an agent of a law enforcement officer.*

(d) The defense under this section applies only to the element of the offense that requires proof that the delivery, financing of the delivery, or possession of cocaine, a narcotic drug, methamphetamine, or a controlled substance occurred in, on, or within one thousand (1,000) feet of school property, a public park, a family housing complex, or a youth program center.

I.C. § 35-48-4-16 (emphasis added). Williams claims that, had this statute been applied to his convictions, his convictions would not have been elevated to Class A felonies because he was only there at the request of Thomas, who was acting as an agent of a law enforcement officer. The problem for Williams is that this statute was not enacted until after he committed his crimes, was convicted, and sentenced for them.

Generally speaking, the law in effect at the time that the crime was committed is controlling. Walsman v. State, 855 N.E.2d 645, 650 (Ind. Ct. App. 2006). Indeed, our supreme court has explained that "[t]he general rule of statutory construction is that unless there are strong and compelling reasons, statutes will not be applied retroactively." State v. Pelley, 828 N.E.2d 915, 919 (Ind. 2005) (citing Martin v. State, 774 N.E.2d 43, 44 (Ind. 2002)). Unless the legislature unequivocally and unambiguously intended retrospective effect as well, statutes are to be given prospective effect only. Id.

But there is an exception to this rule:

An exception to this general rule exists for remedial statutes, which are statutes intended to cure a defect or mischief that existed in a prior statute. When a remedial statute is involved, a court must construe it to effect the evident purpose for which it was enacted. Accordingly, remedial statutes will be applied retroactively to carry out their legislative purpose unless to do so violates a vested right or constitutional guaranty.

16

Martin, 774 N.E.2d at 44 (citations and internal quotation omitted). Despite the language in Martin suggesting otherwise, the court later clarified that "not all remedial statutes are automatically applied retroactively. It has long been the law in this jurisdiction that although statutes and rules concerning procedural and remedial matters may be made to operate retroactively, it is not the case that they must apply retroactively." Pelley, 828 N.E.2d at 919.

Williams claims that section 35-48-4-16 is remedial in nature, i.e., it was intended to cure a defect or mischief that existed in a prior statute.[7] Williams contends that section 35-48-4-16 was enacted to limit the enhancement provisions of section 35-48-4-1 in those situations where there were actually no children present and/or where the police effectively lured the defendant within the zone of enhancement. We do not doubt that this appears to be the purpose of section 35-48-4-16, but we do not agree that this necessarily means it was meant to cure any defect or mischief that existed in the prior statute.

The State notes that section 35-48-4-16 was enacted as part of a larger scheme that broadened criminal liability. See generally Public Law 17-2001 (expanding penalties relating to manufacturing and dealing methamphetamine); Culbertson v. State, 792

---

[7] The State argues that Williams's claim has already been rejected by this court in Polk v. State, 822 N.E.2d 239 (Ind. Ct. App. 2005). Polk did discuss whether section 35-48-4-16 should apply to a defendant who committed his offenses in 1995, and the court held that review of this issue was precluded by the doctrine of res judicata because our supreme court had already addressed the issue in Polk's direct appeal. Id. at 252. Then, in *dicta*, the court noted that "subsequently enacted ameliorative statutes are available only if the statute becomes effective before sentencing," which was not true in Polk's case. Id. Thus, the *dicta* in Polk addressed whether section 35-48-4-16 was ameliorative, not whether it should be applied retroactively. Cf. Jacobs v. State, 835 N.E.2d 485, 491 n.7 (Ind. 2005) (distinguishing court's retroactivity analysis from the question of whether a statute was ameliorative).

N.E.2d 573, 578 (Ind. Ct. App. 2003) (noting that Public Law 17-2001 amended the statute defining maintaining a common nuisance to include maintaining a place for "manufacturing" an illegal substance and also eliminated a personal use exception from the statute criminalizing manufacturing a controlled substance). In fact, Public Law 17-2001 amended section 35-48-4-1 to add being within 1,000 feet of a "youth program center" to the enhancement zones that act to elevate the crimes to a Class A felony. Along with these provisions, our General Assembly enacted the defenses provided by section 35-48-4-16. As the State notes, the General Assembly could well have intended this provision to counterbalance the rest of P.L. 17-2001, which otherwise broadened the scope of section 35-48-4-1. In light of this possible context, we cannot say that section 35-48-4-16 is remedial.

Additionally, even if we assume arguendo that the statute is remedial, this does not mean that the statute *must* be applied retroactively. See Pelley, 828 N.E.2d at 919. Even if a statute is remedial, it will be given only prospective application "[u]nless there are strong and compelling reasons" to do otherwise. Id. at 920 (quoting Gosnell v. Ind. Soft Water Serv., Inc., 503 N.E.2d 879, 880 (Ind. 1987)). Here, we see no clear legislative intent to apply section 35-48-4-16 retroactively. See id. (assuming that statute at issue was remedial or procedural but declining to apply the statute retroactively because the legislature did not expressly make the statute retroactive).

We further agree with the State that Williams's retroactivity argument is off-target for the reason that section 35-48-4-16 does not act to automatically reduce a conviction from a Class A to a Class B felony. Rather, section 35-48-4-16 merely provides a

18

defense for defendants charged with being within one of the 1,000-foot radius protected zones. See Griffin v. State, 925 N.E.2d 344, 347 (Ind. 2010) (concluding that "Indiana Code Section 35-48-4-16(b) constitutes a mitigating factor that reduces culpability, and therefore the defendant does not have the burden of proof but 'only the burden of placing the issue in question where the State's evidence has not done so.'") (quoting Harrison v. State, 901 N.E.2d 635, 642 (Ind. Ct. App. 2009), trans. denied).

Because Williams did not raise this defense at his trial, the State was given no notice or opportunity to rebut the defense at trial by disproving it beyond a reasonable doubt. See id. Applying section 35-48-4-16 to Williams's convictions now on appeal would deprive the State of the opportunity for rebuttal. The only way to apply section 35-48-4-16 would be to require a retrial. We certainly do not believe that our General Assembly intended to grant a retrial to every person convicted under section 35-48-4-1, as it read prior to July 1, 2001, in order to allow them to raise, and for the State to have the opportunity to rebut, the new defenses provided by section 35-48-4-16.

In short, there are no strong and compelling reasons to apply the provisions of section 35-48-4-16 to Williams now, fourteen years after he committed his offenses, twelve years after his trial, and eleven years since the effective date of the statute. In fact, such a retrial would be impracticable and give Williams a windfall that other defendants—those who committed their crimes when Williams did but who did not have their appeals delayed—did not receive.

19

## V. Double Enhancement

Williams also contends that his adjudication as a habitual offender constitutes impermissible double enhancement. Williams notes that the two prior, unrelated felonies supporting the habitual offender finding were his 1988 conviction for Class D felony criminal recklessness and his 1992 conviction for Class D felony possession of a handgun without a license. The latter conviction, which is generally a Class A misdemeanor, was enhanced to a Class D felony based upon the fact that Williams had been convicted of a felony within fifteen years before the date of the offense. See Ind. Code § 35-47-2-23(c)(2)(B).[8] Williams argues that the use of this conviction, which was itself enhanced based upon his prior felony, to support his habitual offender adjudication constitutes impermissible double enhancement.

In support of his argument, Williams relies upon the opinion of our supreme court in Ross v. State, 729 N.E.2d 113 (Ind. 2000).[9] In that case, the defendant was convicted of several crimes, including possession of a handgun without a license. This conviction was elevated to a Class C felony because the defendant had been convicted of another felony within the past fifteen years. Building on this elevated offense, the State also alleged that Ross was a habitual offender. The trial court, acting as the fact finder, determined that Ross had also had two prior, unrelated felonies and enhanced the

---

[8] This subsection now provides that the offense is a Class C felony if committed by a person who has been convicted of a felony within fifteen years before the date of the offense. Prior to 1994, this statute provided that the offense was a Class D felony if committed by a person who has been convicted of a felony within fifteen years before the date of the offense. See P.L.140-1994, Sec. 9.

[9] Although Ross was decided after the date of the commission of Williams's offenses, his conviction, and his sentencing, our supreme court has held that "Ross announced a substantive rule and should be applied retroactively." Jacobs v. State, 835 N.E.2d 485, 491 (Ind. 2005).

20

sentence on the already-elevated Class C felony by ten years. Id. at 115. This court affirmed Ross's convictions and sentence on appeal, and our supreme court granted transfer. See id.

On transfer, our supreme court wrote that, at issue was "whether a conviction once enhanced by the specific sentencing scheme of the handgun statute can be enhanced again by the general habitual offender statute." Id. at 116. The court answered this question in the negative, concluding:

> In light of the statutory construction favoring more specific statutes as opposed to more general ones and because of the Rule of Lenity, a misdemeanor conviction under the handgun statute, once elevated to a felony due to a prior felony conviction, should not be enhanced again under the general habitual offender statute.

Id. at 117.[10] Unfortunately for Williams, this case provides no support for his position.

In Ross, the court held that a misdemeanor handgun conviction, once elevated to a felony based on a prior felony conviction, could not be further enhanced under the general habitual offender statute. Here, however, Williams's prior handgun conviction, which had been elevated to a felony based on another prior felony conviction, was *not itself* further enhanced. Instead, this prior offense, after having been elevated to a felony, was then used as a predicate offense to enhance Williams's sentence on the instant offense of dealing in cocaine, which is a felony under any set of circumstances. Under Ross, there was no double enhancement.

---

[10] In 2001, the habitual offender statute, Indiana Code section 35-50-2-8 was amended to codify the Ross holding that a defendant may not be sentenced as a habitual offender if the enhanced offense "is a misdemeanor that is enhanced to a felony in the same proceeding as the habitual offender proceeding solely because the person has a prior unrelated conviction." See Mills v. State, 868 N.E.2d 446, 451 (Ind. 2007).

21

## VI. Sentencing

Lastly, Williams claims that the sentence imposed by the trial court was improper in two respects. He first claims that the trial court's sentencing statement was inadequately detailed, and he also claims that his sentence is manifestly unreasonable. We address each of these arguments in turn.

### A. Inadequate Sentencing Statement

Williams first claims that the trial court's sentencing statement was inadequate. In Kien v. State, 782 N.E.2d 398 (Ind. Ct. App. 2003), a case decided under the presumptive sentencing scheme in effect at the time of Williams's convictions,[11] we explained:

> Sentencing lies within the discretion of the trial court. Sentencing decisions are reviewed only for an abuse of discretion. When a trial court enhances a sentence, the trial court is required to state its specific reasons for doing so. The sentencing statement must: (1) identify significant aggravating and mitigating circumstances; (2) state the specific reason why each circumstance is aggravating or mitigating; and (3) demonstrate that the aggravating and mitigating circumstances have been weighed to determine that the aggravators outweigh the mitigators. We examine both the written sentencing order and the trial court's comments at the sentencing hearing to determine whether the trial court adequately explained the reasons for the sentence.

Id. at 410-11 (citations omitted).

Williams claims that the trial court's sentencing statement was inadequate because the trial court simply found his criminal history as an aggravating factor and noted Williams's four prior felony convictions and four prior misdemeanor convictions. See Appellant's Br. p. 39. We acknowledge that the trial court's sentencing statement was

---

[11] See Harris v. State, 897 N.E.2d 927, 928-29 (Ind. 2008) ("The sentencing statute in effect at the time a crime is committed governs the sentence for that crime.").

rather terse. However, the statement also indicates that the trial court found no mitigating circumstances—a finding Williams does not challenge on appeal—and noted that the instant convictions were Williams's fifth and sixth felony convictions. The trial court found this criminal history to be an aggravating factor but also agreed with Williams that his sentences should be served concurrently.

"A sentence enhancement will be affirmed in spite of a trial court's failure to specifically articulate its reasons if the record indicates that the court engaged in the evaluative processes and the sentence imposed [is] not manifestly unreasonable." Kien, 782 N.E.2d at 411. Here, the trial court's sentencing statement indicates that the court engaged in the evaluative process, and, as explained below, the sentence imposed is neither manifestly unreasonable nor inappropriate.

B. *Manifestly Unreasonable Sentence*

Williams also claims that his sentence is manifestly unreasonable. At the time that Williams was sentenced, Indiana Appellate Rule 7(B) provided that "[t]he Court [on appeal] shall not revise a sentence authorized by statute unless the sentence is manifestly unreasonable in light of the nature of the offense and the character of the offender." See Hildebrandt v. State, 770 N.E.2d 355, 360 (Ind. Ct. App. 2002) (citing prior version of the rule).

On July 19, 2002, our Supreme Court amended Appellate Rule 7(B) effective January 1, 2003. See Kien, 782 N.E.2d at 416 n.12. The current rule now provides that "The Court [on appeal] may revise a sentence authorized by statute if, after due consideration of the trial court's decision, the Court finds that the sentence is

23

inappropriate in light of the nature of the offense and the character of the offender." This amended rule is directed to the reviewing court and sets forth the standard for that review. Id. That review is made as of the date the decision or opinion is handed down. Id. Thus, even though Williams's sentence was imposed prior to January 1, 2003, our review has taken place after this date, and we therefore apply the current version of the rule. Id.; see also Farris v. State, 787 N.E.2d 979, 981 n.1 (Ind. Ct. App. 2003).

Although we have the power to review and revise sentences pursuant to Appellate Rule 7(B), "[t]he principal role of appellate review should be to attempt to leaven the outliers, and identify some guiding principles for trial courts and those charged with improvement of the sentencing statutes, but not to achieve a perceived 'correct' result in each case." Cardwell v. State, 895 N.E.2d 1219, 1225 (Ind. 2008). Also, "we must and should exercise deference to a trial court's sentencing decision, both because Rule 7(B) requires us to give 'due consideration' to that decision and because we understand and recognize the unique perspective a trial court brings to its sentencing decisions." Stewart v. State, 866 N.E.2d 858, 866 (Ind. Ct. App. 2007). The question under Appellate Rule 7(B) is not whether another sentence is more appropriate; rather, the question is whether the sentence imposed is inappropriate. Fonner v. State, 876 N.E.2d 340, 344 (Ind. Ct. App. 2007). It is the defendant's burden on appeal to persuade us that the sentence imposed by the trial court is inappropriate. Childress v. State, 848 N.E.2d 1073, 1080 (Ind. 2006).

Williams characterizes the nature of his offense as a "run of the mill" dealing offense. We instead agree with the State that the record indicates that Williams was

heavily involved in the drug trade. Both times he sold cocaine to Thomas, Williams had in his possession a bag containing a relatively large amount of cocaine. Williams's niece, Davis, testified that Williams had a bag containing cocaine, marijuana, and "crank." Tr. pp. 178-80. And Fletcher testified that Williams routinely kept a "stash" of drugs. Id. at 210.

Furthermore, Williams's character justifies the trial court's sentencing decision. At the time of sentencing, Williams had an extensive history of both delinquent and criminal behavior, starting with a 1979 juvenile adjudication for what would have been criminal conversion if committed by an adult. In 1980, he had another juvenile delinquency adjudication for what would have been arson if committed by an adult. Although Williams was sentenced to probation as a result of this adjudication, that probation was revoked due to Williams's abusiveness toward staff in a juvenile detention facility and for possession of marijuana.[12]

Williams did not improve his behavior as an adult. In 1983, he was convicted of Class D felony theft and Class C felony burglary. After his release from incarceration and parole in February 1988, he was again convicted later that year for Class A misdemeanor possession of marijuana. He was also charged in 1988 with attempted murder and battery with a deadly weapon, but convicted and sentenced on the lesser-included offense of Class D felony criminal recklessness. His probation for this offense

---

[12] Williams was also charged as a juvenile for battery and arson in 1978, but the pre-sentence investigation report indicates that the disposition of this charge was a "station adjustment." Appellant's App. p. 234. And again in 1979, Williams was charged with arson, but was placed on "non-adjudicated supervision." Id. In 1982, Williams was charged as a juvenile with battery, but was simply "warned and released." Id.

was subsequently revoked. In 1991, Williams was charged with receiving stolen property, and twice arrested for failure to appear in that cause. However, he was ultimately fined for an infraction in that case. In 1992, Williams was convicted of misdemeanor battery. In 1993, Williams was convicted of Class D felony possession of a handgun. In 1995, Williams was convicted for misdemeanor operating while intoxicated. In 1996, Williams was convicted of misdemeanor possession of marijuana, and in 1997, Williams was convicted on a 1995 charge of Class C felony possession of a handgun without a license. It is clear that Williams is a career criminal who has refused to comport his behavior with the requirements of the law.[13]

Williams attempts to lessen the impact of his criminal history by noting his "past drug dependence" and alcoholism. Appellant's Br. pp. 41-42. However, this does not reflect well on his character either. See Hape v. State, 903 N.E.2d 977, 1002 (Ind. Ct. App. 2009) (trial court did not err in failing to consider defendant's substance abuse as a mitigating factor); Roney v. State, 872 N.E.2d 192, 199 (Ind. Ct. App. 2007) ("[a] history of substance abuse may constitute a valid aggravating factor."); Bryant v. State, 802 N.E.2d 486, 501 (Ind. Ct. App. 2004) (trial court did not err in finding substance abuse as an aggravating factor where defendant was aware of his problem with drugs and alcohol yet did not take any positive steps to treat his addiction); Bennett v. State, 787 N.E.2d 938, 948 (Ind. Ct. App. 2003) (holding that the defendant's alcoholism could properly

---

[13] We acknowledge that the record indicates that Williams had both of his legs amputated after a train accident at the age of nine, but this in no way excuses or lessens the criminality of his behavior. Being a victim of an accident, while tragic and unfortunate, does not necessarily "comment favorably on Williams' character." Appellant's Br. p. 42.

have been considered an aggravating circumstance); Iddings v. State, 772 N.E.2d 1006, 1018 (Ind. Ct. App. 2002) ("a history of substance abuse is sometimes found by trial courts to be an aggravator, not a mitigator."); Hornbostel v. State, 757 N.E.2d 170, 184 (Ind. Ct. App. 2001) (recognizing that drunkenness should not to be considered as a mitigating circumstance). Although Williams's criminal history may have been motivated by his substance abuse, it in no way excuses his behavior.

Williams also claims that he received the maximum possible sentence for his crimes and notes that our courts have repeatedly said that "[t]he maximum possible sentences are generally most appropriate for the worst offenders." Wells v. State, 904 N.E.2d 265, 274 (Ind. Ct. App. 2009), trans. denied. However, this is not an invitation to determine whether a worse offender could be imagined, as it is always possible to identify or hypothesize a significantly more despicable scenario, regardless of the nature of any particular offense and offender. Id. "In stating that maximum sentences are ordinarily appropriate for the worst offenders, we refer generally to the class of offenses and offenders that warrant the maximum punishment. But this encompasses a considerable variety of offenses and offenders." Id. We therefore concentrate less on comparing the facts of this case to others, whether real or hypothetical, and more on focusing on the nature, extent, and depravity of the offense for which the defendant is being sentenced, and what it reveals about the defendant's character. Id.

In addressing this argument, we first note that Williams did not receive the statutory maximum possible sentence. The trial court sentenced Williams to the maximum fifty-year sentence on each of his Class A felony convictions. See Ind. Code §

27

35-50-2-4. However, the trial court ordered these sentences to run concurrently. Thus, Williams did not receive the maximum possible sentence. We recognize that maximum, consecutive sentences in the present case would most likely have been inappropriate. See Beno v. State, 581 N.E.2d 922 (Ind. 1991) (concluding it was improper to impose maximum consecutive sentences for multiple drug dealing convictions that were based on nearly identical State-sponsored sales as part of an ongoing "sting" operation). But this does not alter the fact that Williams simply did not receive the statutory maximum possible sentence.

The trial court was also obligated by statute to impose a thirty-year habitual offender enhancement. A habitual offender enhancement must be at least as long as the advisory sentence for the crime to which the enhancement is applied but is capped at thirty years. Ind. Code § 35-50-2-8(h). Thus, if a habitual offender enhancement is imposed on a sentence for a Class A felony, thirty years is both the minimum enhancement (being the advisory sentence for a Class A felony) and the maximum enhancement (being the maximum allowable under the habitual offender statute). Under the facts and circumstances before us, we do not believe that the "worst offenders, worst offenses" analysis is applicable. And even if it were, Williams's sentence is not inappropriate given the nature of the offense and Williams's character as reflected by his lengthy history of delinquent and criminal behavior.

## VII. Habitual Offender Enhancement

Lastly, the State notes that the trial court here treated the habitual offender enhancement as a separate sentence to be served consecutively to the other sentences

28

imposed. This is improper. A habitual offender adjudication does not constitute a separate crime nor does it result in a separate sentence. See Reffett v. State, 844 N.E.2d 1072, 1074 (Ind. Ct. App. 2006) (citing Greer v. State, 680 N.E.2d 526, 527 (Ind. 1997)). A habitual offender finding results in a sentence enhancement imposed upon the conviction of a subsequent offense. See id. Thus, "trial courts must impose the resulting [habitual offender] enhancement upon only one of the convictions and must specify the conviction to be so enhanced." Greer, 680 N.E.2d at 527.

We therefore conclude that the trial court erred by ordering the habitual offender enhancement to run as a separate sentence. We reverse this portion of the trial court's sentencing statement and remand with instructions that the trial court shall specify which of Williams's sentences is enhanced by the habitual offender adjudication.

### Conclusion

The trial court did not err in denying Williams's untimely motion for change of judge, nor did the trial court abuse its discretion in the admission of testimony regarding the conduct of the deceased confidential informant. The State presented sufficient evidence to support Williams's convictions, and we will not apply Indiana Code section 35-48-4-16 retroactively. The enhancement of Williams's sentence as a habitual offender did not constitute an impermissible double enhancement, and the trial court did not err in sentencing Williams to an aggregate term of eighty years incarceration. The trial court did err, however, by ordering the habitual offender enhancement to be served as a separate sentence, rather than as an enhancement of the sentence imposed on one of Williams's convictions.

29

Affirmed in part, reversed in part, and remanded.

ROBB, C.J., and BAILEY, J., concur.